Good morning. May it please the court. My name is John Williams. I represent General Charles Yeager and the Yeager Foundation in this appeal. Apparently, well, I'd like to reserve five minutes of my time for rebuttal, if I may. Yes. Watch your clock yourself, please. I'll try to remind you. I will. Thank you, Your Honor. Apparently, my youngest son has given me his cold, so if my voice suddenly fails me this morning, I ask the court's indulgence. All right. This case is certainly well briefed, but I'd like to put a finer point on some of the main issues before the court. And so allow me to start with the sham declaration question. First off, I'd like to point out that General Yeager has made all of his arguments before this court using only the evidence that the court ultimately allowed him. Nevertheless, it's our position that the district court went too far in finding that the entirety of General Yeager's declaration was a sham. That issue implicates questions of credibility. And even though the trial court may not believe that General Yeager, at the age of 86, had a limited memory and appreciation for the scope of his claims and some of the facts in this case. Well, it's rather unusual for him to not remember anything. I understand that that's the record, Your Honor. I think that's part of General Yeager's experience and persona as well. I would submit to you that even in his prime, having accomplished as much as he has, he was not educated and he was never a detailed person. He was a handshake guy. And so for him, a lot of these issues were details, especially as they related to supporting the various contentions that were made. These were details that he was not educated. He went into the Army at 18. That's correct, Your Honor. He never had any post-high school education. He never went to a military academy? I don't believe so, no. I believe that he came up through the enlisted ranks, Your Honor. And so the main point, I think, is that this is an issue of credibility. Certainly, the Bolins would have had the ability on this record to cross-examine General Yeager with respect to his recollection and make the argument that he was not a good witness or a good historian. So when he makes his declaration, we all just say, okay, that's what he wants us to know, and that's really true, and we can't question it? No, I just don't think that the finding that the entire declaration was a sham, which is something this Court has said is an extreme remedy and is something this Court has also said should be used with great caution because it does implicate issues of credibility. The finding of a sham was essentially that all but three or four paragraphs in that declaration would be completely inadmissible. And so I think that the more proper ruling would be for the Court to sustain objections to various paragraphs but not to find the entirety of the declaration as a sham. Well, so the district court found that this affidavit was a sham. What is our standard review that applies to that? Well, you raise an interesting point, and I think this also underscores the error that the district court made here. The district court set on the record in its statement, in its ruling, it first laments this whole practice of attorneys raising multiple objections, evidentiary objections. But then it says, in any event, this will be reviewed on a de novo standard of review. And that's incorrect. The fact of the matter is that evidentiary rulings at summary judgment are reviewed for an abuse of discretion. And I would suggest to this Court that the district court was too eager to pull that trigger because it believed that it would be up to a de novo review at this level. And that's just not the case. What the Court should have done is exercised its discretion and provide the record as to why it was doing that and not say this entire declaration is a sham. And it doesn't matter because the court of appeal will get to look at this de novo anyway. I note that the Court and that the Bolins, but in particular the Court in making this ruling, cited to out-of-circuit authority for finding of a sham declaration. And I would suggest to this Court that that out-of-circuit authority is not in line with the Ninth Circuit's more conservative approach of being more cautious in terms of finding entire declarations are a sham at the summary judgment stage. But, again, I think it's important as we go through the other arguments here that the Court remembers that this appeal is based upon, only based upon the evidence that the Court found to be admissible. So moving on to the 800-pound gorilla in the room, I'd like to speak about the single publication rule issue here. As this Court is well aware, the single publication rule is meant to prevent multiple claims from arising from a single publication to a mass audience. So, for example, if you have a website and you have different people going to that website at different times, there would not be a new cause of action for each person who visited that website or who was exposed to that content. But that's simply not the situation here. Here we have a situation where you have content that's posted, and when it's posted, originally it is authorized. But it only subsequently becomes unauthorized and, therefore, actionable later on. So wound up in this whole analysis of the single publication rule is an issue that no other case that was cited to the Court in any of these briefs has dealt with, and that is when content is permitted at the time that it's published, originally published, but then later becomes unauthorized, when does the cause of action accrue, and what role does the single publication rule play in that analysis? Probably the biggest mistake that the trial court made, the biggest flaw in its analysis, is failing to recognize when the use of General Yeager's name and likeness became unauthorized. General Yeager had alleged that it was originally authorized for purposes of selling memorabilia on the Bulletin's website, and then the Court subsequently found that it was withdrawn in 2005 with the cease and desist letter. But it never analyzes that that's the starting point for the accrual analysis. Instead, it focuses very heavily on pre-2005 content on the Bulletin's website and talks about how that content has been in existence since 2003 or some other time. But really, that's irrelevant up until the time that the content becomes unauthorized. And you don't see these in these other cases, these other reputational tort cases, because in all those cases, there's never a question that it was a tort at the time that the defamatory statement was made, or with respect to some of these right-to-privacy cases, that there was no question that the defendants did not have permission. But we have a different situation here. We have a situation where it was authorized and then it became unauthorized. And so how does the single publication rule fall in there? Well, it's our position that the record supports various republications of the Bulletin's website after 2005. And in particular, with respect to the representation that the Bulletin's and General Yeager are the best of friends and have access to his private collection. Those are the precisely the types of false endorsement claims that Section 3344 on this. Well, how does this affect single publication? You say there was a withdrawal. All right. At that point, there's a publication following the withdrawal. It may be a continuing publication. But at some particular point, it's no longer authorized. That's correct. But the Court didn't... As of that day, there's a publication, right? At the time it became unauthorized, was there a publication? There's a publication. Why isn't that a single publication? I don't think the Court ever made that finding. And that's the problem here. The Court never found, because it never made that delineation between when this content was authorized and when it later became unauthorized. And so there isn't really a finding in this record with respect to... But we're talking about the application of a rule. Yes. Why would the single publication rule not apply to that circumstance? I think that it would apply if you have a finding that at the date that this content became unauthorized, there was a publication. But also, we know that the single publication rule does not immunize subsequent republications of the offensive content. And what were the changes that would make it republication? This record shows that post-2005, there were changes made to the website at which time the original offending content, the affiliation content that the Bolins are best of friends with General Jaeger and that they have access to his private collection, never disappeared off the website. So when you have changes made in 2007, for example, where Connie Bolin modifies the Tribute to the Aces page, and that's at... She modified the Tribute to the Aces page, and that was the event at which this Leiston Legends lithograph was produced. In doing so, she republishes content regarding General Jaeger's attendance at that event and the signing of the Leiston Legends... There was no change in the Jaeger material, right? There's no change with respect to those affiliation material. That's correct. But my point is... So you're saying is there changes in the surrounding material that's a republication? I think that's what California law requires. In fact, if you look at the Kenneret case, which was the case where you had the Helter Skelter first published in hardback and then published in softbound edition, the Court found that that's a new edition, even though the content was identical. And here, if there are changes made to the website... And this, again, the Court found to be a fully integrated publication. Just like a book, if you make changes to pages of a book and then you republish the entire book, but the offensive content remains, then you have republished the offensive content in a new edition of the website. And so we have, post-2005, in this record at least two examples of when changes were made to the website, but the offending content, which now is unauthorized, still remains. And folks who would visit the website in 2005 or 2007 or even 2009 would see a different website, a different edition, a different version of that website. And so you have a republication, and once you have a republication, you have the accrual of the statute of limitations beginning again. And this goes into this analysis that I think Justice Werdegaard talks about in the concurring opinion in Kristoff. But that's all it is, a concurring opinion. It is. But because the case was being sent back down for some factual determinations, I think that it's instructive here. Well, it's not the Supreme Court speaking. I'm sorry? It's not the Supreme Court speaking, so it's not the law of California. In fact, it was the California Supreme Court. Oh, it's just Justice Werdegaard. That's true. That's true, Your Honor. But the majority did find that there was a factual question on whether the label itself had been published or when the label itself had been published. And as Justice Werdegaard further explained, there's this concept of a discrete publishing event. It's sort of the metric that needs to be used to decide when something is published and republished. And we don't have evidence here with respect to why certain things were republished, why changes were made, and what changes were made. And just like in Kristoff, those seem to be inherently factual questions that need to be decided and should require this case to be remanded back to the district court on those issues, given that the Bolins have failed to meet their burden on that affirmative defense. I see that my time is running short. I'm going to shift very quickly to both the UCL and the Lanham Act claims, just to reinforce the point that both are equitable in nature and that the district court erred when it found that a legal defense, that is California's single publication rule, which is meant to restrict tort claims and damages, can be used to bar an equitable claim. The other UCL issue is the UCL has a four-year statute of limitations where this content became unauthorized in 2005. Certainly the claim was brought within that four-year period, and there is nothing that provides an absolute bar to that claim in law. It was just found to be untimely. I will reserve the balance of my time for rebuttal unless there are any further questions. Thank you. Good morning, Your Honors. Todd Noonan here on behalf of Connie and Ed Bolin, Aviation Autographs and Bolin & Associates. Your Honor, in this case, the district court ruled correctly that General Yeager's claims were time-barred. I would like to deal in order with the issues raised by my counterpart, starting with the evidentiary issues on the sham declaration. First, so that the record is clear, I do not believe the district court's reference to de novo review was made with respect to the sham affidavit finding. Judge Shub was concerned with the extensive evidentiary objections that had been lodged with the court, and his comment was in passing with respect to those evidentiary objections. He made no such comment with respect to the sham affidavit rule, and his analysis there was very thorough, followed the controlling cases, and dissected the record beforehand. And in terms of that ---- But he's not correct on the evidentiary rulings part, is he? No. The evidentiary rulings are abuse of discretion. Yes. So if he got that part wrong, maybe he got the other part wrong, too. Well, it will be a shorter opinion for Your Honors then, if that is the case. But I think it is uncontested that the evidentiary rulings, including the sham declaration ruling, were abuse of discretion. And he did run through the Ninth Circuit controlling authority before looking at the actual testimony that General Yeager gave here. And that testimony is really the best evidence of why the court ruled the way that it did. The questioning was not complex. The questioning was comprehensive, questions going to only evidence that General Yeager could provide, his personal interactions with the Bolins. There are fraud claims, for example. The only evidence of what our clients or the Bolins were alleged to have done, from General Yeager's perspective, has to come from General Yeager. But his answers uniformly and consistently were, I don't recall. And so through those answers, he provided a very direct statement. And his statement under oath was he recalled nothing of substance with respect to these issues. After the close of discovery, the Bolins moved for summary judgment. It's at that point that this declaration comes forward. And, frankly, we might have a different case if there was a thorough explanation given by General Yeager as to why he answered those questions, I do not recall. But there was no medical testimony provided, for example. His counsel provided no declaration of confusion or loss of memory. General Yeager in his own declaration didn't admit to having any confusion or loss of memory. There was simply an after-the-fact construction, an excuse, if you will, for what was a very consistent approach during the testimony. You know, you wonder why all this happened, but a very proud man who did have memory loss might want not to own up to it. I agree, Your Honor. And that is why in evaluating this record, it's very actually important to read through the testimony itself to examine how those questions that he did answer and those questions that he didn't answer. And it's clear that he does have a recollection and he does provide testimony on those issues that he wanted to testify about. And it's really the entirety of the record there on that testimony that I think struck the district court and caused it to make this relatively unusual ruling, particularly with somebody of General Yeager's prominence. General Yeager really left the district court with very little choice in this context. The entire ruling was, by Judge Shub, was just premised upon looking at the declaration and looking at the deposition testimony and looking at the affidavit and just making a comparison between those things, right? Yes. There was no other evidence brought in by General Yeager apart from those two items of testimony. In other words, there was no medical evidence or no other types of evidence that might be used. So is that determination, then, after examining those things, is that determination that the affidavit was a sham, is that a finding of fact? In fact, I believe that's what he's required to do, is make an explicit finding. The Ninth Circuit law requires him to make an explicit finding that the declaration is a sham. If he doesn't make that ---- Is that a legal determination? It is not one that is reserved to the jury, if that's what you're asking, Your Honor. It is a ---- Well, that's a preliminary ruling. Yes. Similar to the evidentiary standard, that would apply. A foundational ruling, if you will. Now, if we were to strike this as sham, as the Court did, what is left for General Yeager? What things do you think the statute of limitations had run on? Your Honor, we believe that the statute of limitations had run on all the claims. But to answer your first question, what's left, of course, there is the evidence that our clients put in. And there's no getting aside that fact, that that evidence is there and it's part of the record. There's no substantive rebuttal evidence from General Yeager. With respect to the statute of limitations, our foundational point is that the gravamen of these claims all arise out of an alleged violation of the right of publicity relating to putting statements on their website, the aviation autographs website. And I think it's very critical to, as a starting point, talk about the accrual date, the issue that was raised by my counterpart concerning the cease and desist letter that was sent in 2005. Interestingly, there's a two-year statute for the right of publicity claim. So it's our position that these claims were still time barred, notwithstanding any longer or earlier accrual date, because 2005 was more than two years prior to the filing of this action. But General Yeager alleged in his complaint, actually in all three of his complaints, including the one that he filed pro per over his own signature, that he had never authorized these general uses of his name. He had never allowed a reference, for example, that he was best friends with the Bolans, or the use of the photograph with him posing with General Gunther Rall, sorting through the memorabilia. When you look at the complaint, and this is in paragraph 63 and 69, the words never are used. And that's a very clear allegation. And so when the district court found that the alleged violations were vividly apparent from 2000 onward, those are the allegations that support that finding. What General Yeager did do was authorize sale of some prints, the Leyes and Legend prints, the Hay Park prints. But what he is saying in his complaint, fairly read, is that he did not authorize these other uses that tied him, if you will, to these prints in that fashion. And so the accrual date is, in fact, the year 2000 for the bulk of these references. That's when this publication occurred, save one, which is the October 2003 reference when the Tribute to Aces Program was described. But even there, that is more than four years out from the filing of this complaint. Now, Mr. Williams also discussed the role of republication. And there, the law is still evolving, but within the context of the Internet, it's clear that there needs to be a modification of substance as to the statements that are at issue. Peripheral changes to the website in unrelated respects are not a republication with respect to the alleged offending statement. And here, that's all we have. And it's actually worth looking at the specific incidents that are raised here. In 2007, the Bolins added a reference to the death of two of their friends, General Robin Olds and Tex Hill. That was the reference added to the Tribute to Aces page because they had been attendees at Tribute to Aces as well. There was no change to the reference to General Yeager. Similarly, in 2009, on their News and Events page, they made reference to the death of Gunther Rohr, a famed German ace. Again, no change to the reference to General Yeager. So unlike the Canorac case where you have a publisher actually issuing an entire new book in paperback intending to reach a new audience, here you have no such showing with respect to these modifications to the website. They simply don't constitute a republication as to General Yeager. Let me ask you as to the false advertising claim. There is that only an injunction is sought with respect to that claim? No. With the Lanhamac claim. No, not Lanhamac. It's false advertising. Oh, the false advertising claim. You know, I'd have to pull back out the pleading, but they certainly did include within their request a request for an injunction under the State law claim. And do you think the single publication rule bars an injunction for false advertising? In other words, if they let the original statute pass for statute of limitations that permanently someone is entitled to continue to use that material without ever being subject to injunction? Yes, Your Honor, although there the ruling would follow less from the single publication rule than from the notion that equity follows the law in the sense that if I have a time-barred claim, I cannot bring, you know, not only have I lost my claim for damages, but I've lost my claim for an injunction. And, you know, in terms of the distinction here being drawn between equity and legal claims for application of the single publication rule, I think that distinction is being drawn a little bit too starkly. The single publication rule grew out of and actually predated these statutes. The California statute was enacted in 1955, and the single publication rule existed as a development of common law well before that, developed by the courts to deal with the multitude of claims and the endless tolling of a statute of limitations that you can face when you have claims based upon a potential publication being seen by new people down the road. And so this, the statute in 1955 was merely a codification of an existing law. And those same concerns are just as paramount when you're looking at a claim, for example, under the unfair competition law, which simply builds upon, in many cases in California, predicate acts, such as the statutory violation of Section 3344. And so the same concerns for a multitude of actions and the same concerns for endless tolling of the statute of limitations apply just as strongly to a claim brought under the unfair competition law as they do to the original derivative claims. And that is why we've argued in the papers that the distinction between legal and equitable doesn't mean that these same policy concerns that drove the single publication rule don't apply. Let me ask you sort of a related question, though. You mentioned the Lanham Act. The briefing is not real clear to me, but apparently, you know, there's some, there's some contention that there's no statute of limitations at all under the Lanham Act. Isn't that sort of argued in the briefs here? It is touched upon, Your Honor. But I don't think that was ever raised in the district court, was it? No, Your Honor. It was not. And, in fact, you raise a good point, and I'm glad to have the opportunity to discuss it. At the district court, the only fair characterization of our argument is that we raise it as a statute of limitations argument. And General Yeager addressed it in exactly the same fashion. Both in his briefing and at oral argument, the reference was made to statutes of limitations. That's what you contested in the district court. Yes, it is, Your Honor. And that's why, and then the district court applied the single publication rule. Correct. All right. And this business about whether or not a statute of limitation even applies under the district court was first raised on appeal. Correct, Your Honor. Is that right? And kind of indirectly at that, it seems to me. Yes, Your Honor. We have argued that that contention has been waived for exactly that reason, is that if there was going to be an argument about the test that should be applied or the standard that should be applied, the better time and the required time to raise that was before the district court. I will say, however, that to the extent the Court considers that issue, it remains unsettled in the Ninth Circuit, and as far as I can tell throughout this country, whether or not laches is the sole remedy for timeliness. I have absolutely read the Jarrow case, and it certainly pushes, pushes this circuit towards laches as the sole remedy, but the terms might and elusive are certainly ever-present throughout that Court's opinion. Later cases have not foreclosed statute of limitations. And if I were to project forward, Your Honors, I believe that this Court will find that statute of limitations coexists with laches, in particular when it's called to face upon or face claims that have been enacted or based upon provisions enacted after 1990 when Congress enacted its four-year catch-all statute of limitations. I found no court, no case in this Court applying that catch-all statute of limitations to the Lanham Act. It doesn't apply to our case because General Yeager's claims predate 1990. But there are provisions of the Lanham Act relating to trademark dilution that will tee up that issue. And for that reason, I think ultimately this Court will find statute of limitations is on equal par with laches in terms of the application under the Lanham Act. Your Honors, if you have no further questions, I think the other issues are covered very well in the briefs, and we will submit. Thank you. Thank you. I'd like to respond briefly, Your Honor, to some of the contentions that were made with respect to Judge Shub in the standard of review on these evidentiary objections. At ER 1300, the judge clearly says that the matter will proceed to appeal, that is, these evidentiary rulings where the trial court's rulings on each of the objections can be scrutinized, presumably under a de novo standard of review. I think it's pretty clear that the courts just have that standard incorrect, and it wasn't just a passing reference to that. Also, the Bolins have contended that in General Yeager's operative complaint, he never gave consent for them to use his name and likeness. And I would point the Court to ER 147 at paragraph 27, and this concerns the Leiston Legends prints in particular. The allegation says, for any unsigned lithographs, the agreement, that General Yeager had with the Bolins required that General Yeager be provided with a 10% royalty for the use of his name and likeness, and that's repeated elsewhere in the allegations as well. So what you have here clearly is disputed facts about what the nature of this agreement was. But to say that General Yeager never gave his consent and that it wasn't relevant than what happened in 2005, I don't think accurately portrays what the allegations were. With respect to the modification of the website as it related to these various references to General Yeager, I think we would draw the opposite inference that has been argued by the Bolins here, and that is there doesn't need to be modification of the offending or the unauthorized content. The fact that it wasn't modified is the very definition of its republication. Other parts of the site are modified. A new version of the website is published, but the offensive content remains. And so long as it remains in further versions or additions of what the district court found to be a fully integrated website, that is changed to one page is changed to the entire website, then you have a new accrual date under the single publication rule. Clearly the single publication rule, and there's no authority that says otherwise, is not meant to immunize repeated republications of unauthorized or offensive content. And so when you have a change here, you have a republication. And if I could focus on Kennerec a little bit, I think that if you apply Kennerec's reasoning, which has been adopted by the California Supreme Court, Kennerec would even allow a situation where you have a website where the look and feel is different. That's the analogy I would draw to a hardbound versus a softbound book. But the actual content of the webpage is the same. And in that situation, California law and Kennerec has said, and this again has been adopted by the California Supreme Court, that that is a republication under the single publication rule. The standard that I'm hearing being talked about here is that there has to be a modification to the particular content in question, and that's not what Kennerec says. Kennerec would allow for a new website with a different look and feel but the exact same content to be a republication of the offending or defamatory content. And in all these cases, the analogy is continuously made to print media, to a book. And here you have a modification of a page, but if on another page the unauthorized content is still there and you republish that book, then under the single publication rule you have a republication. Unless there are any further questions, we will submit. I've wondered whether this is a case that we ought to send to our mediators. Have you people tried to settle this case? I'm sorry. I didn't understand the Court's question. Have you tried to settle this case? Should we send it to our mediators? I think a determination was made at the early mediation conference that that would not be fruitful. I know that there have been ongoing discussions between the parties during the course of this appeal. Your Honor, may I address that? I know it was a set-up term, but it was before Mr. Williams' involvement in the case. We did, in fact, go through the mediation process. Thanks to our mediation program and assisted by the mediators. You don't want to have another go at it? We never did, Your Honor. Okay. As would we, Your Honor. Thank you for that correction. Now that you mention this did happen before I was involved, there were a number of other unrelated cases that he also helped us with as well. So that was something that we explored. Okay. Thank you very much. Thank you. This case, I argue, will be submitted. Court will stand in recess for the day.
judges: Fletcher, Reinhardt, Tashima